UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No. 08-cv-02256-WYD

LETICIA BALDWIN for J.N. (a minor),

　　Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

　　Defendant.

_____

**ORDER**
_____

I.　　INTRODUCTION

　　THIS MATTER is before the Court on review of the Commissioner's decision that denied the application filed by Plaintiff J.N.'s mother Leticia Baldwin for supplemental security income ["SSI"] childhood disability payments under Title XVI of the Social Security Act, 42 U.S.C §§ 1381-1383 ["the Act"].  For the reasons stated below, this case is reversed and remanded for further factfinding.

II.　　BACKGROUND

　　Plaintiff J.N. [hereinafter "J.N."] was born in February 1996.  He is allegedly disabled by mental retardation, attention deficit hyperactivity disorder ["ADHD"] and a severe learning disability.  J.N. has been receiving special education since the first grade.  (Administrative Record ["R."] 22-23.)  He requires substantial support and accommodations in school, and receives individualized tutoring and assistance.  (*Id.* 25, 123-128.)

J.N.'s mother stated in a Function Report that Plaintiff has difficulty with stuttering and takes a long time to communicate his ideas. (R. 80.) Dr. Marten, an evaluating psychologist, noted that J.N.'s "speech appeared mildly unclear with some difficulty pronouncing consonant sounds such as 'TH' sounds" and "he displayed some stuttering as well." (*Id.* 137-38). He also noted that J.N. spoke at a slow and hesitant rate. (*Id.*) J.N. spends part of the day working directly with special education teachers, and part of the day in regular classes for subjects such as art and gym. (*Id.* 25.) His school has assigned a paraprofessional to assist him in the regular classes. (*Id.* 25-26.)

J.N. asserts that without constant assistance and redirection from the paraprofessional, he would not be able to function in the regular classes. As his mother noted, "[t]he teacher, she made it clear this year she has just not the time to have a fourth grade class with 20 students in it and put all her time towards [J.N.] and to help him one-on-one. She said she doesn't have the time for it." (R. 25.)

A 2005 Individualized Education Program ("IEP") revealed difficulties J.N. has at school. (R. 123-128.) It states that J.N.'s "difficulties with receptive and expressive language skills impact his ability to access and progress the general curriculum. (*Id.* 123.) J.N. "is not proficient on his reading, writing and math goals. He has a hard time remaining on task in class which causes him to fall behind in his work. He also misses much of the lessons taught because he cannot focus or understand instruction." (*Id.*) J.N. "needs extra time to complete assignments, frequent checks for understanding, small groups and peer tutoring. He needs a scribe for testing, and/or written assignments, and frequent redirection for completion of tasks. He needs preferential seating and modified grading." (*Id.*)

At home, J.N. needs frequent reminders and prodding to complete basic tasks. (R. 27-30.) He is aggressive to peers and siblings, frequently biting, kicking and hitting them as a result of perceived conflicts. (*Id.* 30-31.) He is also verbally abusive. (*Id.* 31.) His mother noted that he "bites his hand. He has a big lump on his hand right now from where he bites his hand where he gets frustrated. . . ." (*Id.* 30.)

J.N. underwent a psychological evaluation with Brad Marten, Psy.D. on June 6, 2006. (R. 136-40.) Dr. Marten diagnosed on Axis I: ADHD, "combined inattentive and hyperactive type"; "Language disorder, mixed receptive and expressive type, provisional"; "Articulation Disorder"; "Reading disorder"; "Rule out mathematics disorder"; "Rule out writing disorder"; and "Cognitive disorder, not otherwise specified". (*Id.* 139.) On Axis II, Dr. Marten diagnosed "Mild mental retardation, provisional" and "Rule out borderline intellectual functioning." (*Id.*)

Part of Dr. Marten's testing involved administration of the Wechsler Intelligence Scale for Children, Third Edition ("WISC-III"). The testing revealed a performance IQ of 59, a verbal IQ of 80, and a full scale IQ of 68, "placing [J.N.] at the high end of the intellectually deficient range of functioning at this time." (R. 139.) J.N.'s school had previously performed IQ testing on December 8, 2005, utilizing the Wechsler Intelligence Scale for Children, Fourth Edition ("WISC-IV"). (*Id.* 129.) The school testing produced a higher full-scale IQ score than the testing performed by Dr. Marten. The administrative law judge in this case ["ALJ"] relied on the higher scores to deny J.N.'s claim. (*Id.* 12.)

The application for J.N.'s SSI benefits was filed on December 9, 2005. J.N.'s mother claimed that he became disabled as of December 9, 2005, when he was nine

years old, because of ADHD and mental retardation. (R. 66-71). The application was denied at the initial level. A hearing was requested before an ALJ, which was held on January 9, 2007 (*Id.* 19-38). The ALJ issued a decision dated August 2, 2007, which found that J.N. was not disabled. (*Id.* 8-18.)

The sequential evaluation process the ALJ was required to follow in his decision, as set forth at 20 C.F.R. § 416.924, requires the ALJ to determine: (1) whether the child is engaged in substantial gainful activity, (2) whether the child has an impairment or combination of impairments that is severe, and (3) whether the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Pt. 404 (the Listings). If the impairment meets or medically or functionally equals one of the Listings, the child is considered disabled. *Briggs ex rel. Briggs v. Massanari,* 248 F.3d 1235, 1237-38 (10th Cir. 2001).

The ALJ found at step one that J.N. had not engaged in substantial gainful activity and that he was a school-age child. (R. at 11.) At step two, the ALJ found that J.N. had severe impairments (ADHD and borderline intellectual functioning). (*Id.*) At step three, he found that J.N.'s impairments did not meet, medically equal, or functionally equal the requirements of any presumptively disabling impairment listed in the regulations. (*Id.* 12-18.) The ALJ thus concluded that J.N. was not disabled within the meaning of the Act. (*Id.* 18.)

Additional evidence was submitted on behalf of J.N. to the Appeals Council. (R. 4, 148-151.) The Appeals Council denied J.N.'s request for review, stating that it considered the reasons why claimant disagreed with the decision and the additional evidence provided on his behalf. (*Id.* 1-4.) It found that this information did not provide

a basis for changing the ALJ's decision. (*Id.* at 2.) The ALJ's decision thus became the final decision of the Commissioner, and this case is ripe for judicial review pursuant to 42 U.S.C. § 405(g).

III.    ANALYSIS

    A.    Standard of Review

A Court's review of the determination that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence. *Hamilton v. Sec. of Health and Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990). "It requires more than a scintilla of evidence but less than a preponderance of the evidence." *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988).

"Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). I find for the reasons discussed below that this case must be remanded to the Commissioner for further factfinding.

    B.    Whether the ALJ Erred in Finding that J.N. Did Not Meet the Requirements of Listing 112.05 for Mental Retardation

J.N., through his mother, claims that the results of Dr. Marten's IQ tests established that he met the presumptively disabling requirements of mental retardation

for children as set forth in Listing 112.05C of the federal regulations. Further, it is argued that the ALJ's decision to reject the results of Dr. Marten's testing in favor of the school testing is the crux of error in this case. The Commissioner maintains that the ALJ's decision – that Plaintiff was not disabled within the meaning of the Act – was supported by substantial evidence and is free of reversible error.

Turning to my analysis, Listing 112.05 states that mental retardation is "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning" and requires that either part A, B, C, D, E, or F of that Listing be satisfied. 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 112.05. Plaintiff asserts that Section C of 112.05 is satisfied, which requires that the child have "a valid verbal, performance, or full scale IQ of 59 or less." *Id.*

It is undisputed that Dr. Marten performed testing in June 2006 and assessed Plaintiff's performance IQ at 59. (R. 139.) He opined that his findings "appeared to be a valid representation of [J.N.'s] intellectual and cognitive functioning at this time." (*Id.* 138.) Plaintiff argues that Dr. Marten's testing shows that J.N. is disabled pursuant to Listing 112.05C.

The ALJ determined that J.N. does not meet Listing 112.05C based on the results of intelligence testing performed by J.N.'s school on December 8, 2005, six months before Dr. Marten's testing. (R. 11, 129.) Those scores indicated that J.N. "was functioning within the low average range of cognitive ability, but that his Verbal Comprehension Index measured within the average range; his Perceptual Reasoning Index measured within the borderline range; his Working Memory Skills were a strength, measuring in the average range; and his Processing Speed measured within the

average range." (*Id.*) The school also noted a Full Scale IQ of 83, which the ALJ stated was "considerably higher than that measured by the consulting psychologist." (*Id.*)

The only reason that the ALJ stated at step three to give credence to the school report over Dr. Marten's report in finding that J.N.'s impairments did not meet the Listings was that "[t]he validity of [J.N.'s] IQ scores as measured by the consulting psychologist [Dr. Marten] are questionable, considering the higher overall results the claimant obtained upon administration of the WISC-IV." (T. 12.) The ALJ did not investigate the reason(s) for the different scores, nor did he provide any analysis or discussion at step three regarding why the school testing was more accurate than Dr. Marten's testing.

Plaintiff argues that the ALJ's reliance on the school testing as the basis to invalidate the results of Dr. Marten's testing was inappropriate for several reasons. First, the school administered a different test than Dr. Marten. The school performed the WISC-IV whereas Dr. Marten administered the Third Edition (WISC-III). Plaintiff asserts, and I agree, that the WISC-IV appears to differ from the WISC-III in crucial respects that are pertinent to the requirements of the Listing and J.N.'s specific intellectual deficits.

Specifically, it is undisputed that the WISC-IV does not report a "performance IQ" score. (R. 129.) Although that difference may be inconsequential in some cases, it is extremely significant in this case since Plaintiff relies on Listing 112.05C which establishes disability when the performance IQ is 59 or less. I agree with Plaintiff that because the WISC-IV does not report a performance IQ score, the ALJ could not rely on it to determine whether J.N. met the listing with respect to his performance IQ, at least

not without evidence that supports reliance on WISC-IV in this regard.[1]  Furthermore, there does not appear to be a score reported on the WISC-IV that would permit the ALJ in his own lay judgment to determine that J.N.'s performance IQ is other than that reported by Dr. Marten.  The ALJ is not a medical expert, and is not competent to reject medical evidence on the basis of his lay interpretation.  *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) ("the ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion*") (emphasis in original).

These are medical issues that would need to be explored and resolved with the psychologists.  In other words, rather than attempt to interpret the test results himself, the ALJ should have contacted Dr. Marten and/or the school psychologist to investigate the apparent conflict between the test results.  *See* 20 C.F.R. § 404.912(e)(1) ("[w]hen the evidence we receive from your ... medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination ... We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved").  The use of the term "will" in the regulation implies a mandatory procedure.

---

[1] The current version of Listing 112.05C became effective September 20, 2000, and directly tracks the structure of the WISC-III.  The WISC-IV was released in 2003, and the Social Security Administration ["SSA"] has not updated the Listing to reflect the different scores reported by the new version of the test.  There is no information in this Record or in any of SSA's regulations or rulings that instructs how to translate the results of the WISC-IV into the scores needed to satisfy the Listing.  Consequently, in the event of a conflict between the WISC-III and WISC-IV (as in this case), it would appear that the WISC-III provides the most appropriate data for evaluating whether the claimant meets the Listing.  The ALJ did not consider this issue.

I also agree with Plaintiff that this case illustrates the problems that arise when an ALJ attempts to interpret complex medical evidence himself, rather than relying on medical experts. As Dr. Marten explained in his report provided to the Appeals Council, although at first blush J.N.'s scores on the WISC-III and WISC-IV may appear inconsistent, there is a perfectly rational explanation for the difference. Without the benefit of psychological expertise and training, the ALJ was ill suited to interpret the test results, and certainly was not qualified to deny the claim based on his layperson's assessment that "[t]he validity of the IQ scores as measured by [the WISC-III] are questionable." (R. 12.) This is particularly true since even Dr. Marten noted that he needed the raw data of the school test in order to determine the differences between the tests, data that the ALJ did not have when issuing his decision.

The Commissioner argues, however, that the additional evidence provided to the Appeals Council should not be considered as it would not have changed the ALJ's decision. I disagree. Additional evidence must be considered by the Appeals Council if it is new, material, and related to the period on or before the ALJ's decision. *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004). It is undisputed that the evidence submitted to the Appeals Council was new and that it related to the testing done before the ALJ's decision. The only issue is whether it was material. Evidence is material to the determination of disability "if there is a reasonable possibility that [it] would have changed the outcome." *Id*. Evidence meets this standard by reasonably calling into question the disposition of the case. *Lawson v. Chater*, No. 95-5155, 1996 WL 195124, at *2 (10th Cir. April 23, 1996).

Dr. Marten's report provided to the Appeals Council outlines the impact of the differences between his test and that conducted by the school psychologist. (R. 148-50.) As explained therein, the school testing omitted an important sub-test which was a very significant factor in the low performance IQ score demonstrated by Dr. Marten's testing. The raw test data obtained from J.N.'s school reveals that the "Coding" sub-test from the WISC-IV was not scored due to an "announcement interruption". (*Id.* 150.) Dr. Marten explains in his report that the difference in the overall IQ scores between the two instances of testing is largely explained by the omission of the "Coding" sub-test in the school's testing, which is one of the weakest aspects of J.N.'s intellectual functioning. J.N. performed very poorly on the "Coding" sub-test during Dr. Marten's testing; his score on the "Coding" sub-test was 1 (one). (T. 148). In place of the"Coding" sub-test, the school psychologist substituted the "Cancellation" subtest, an area of relative strength for J.N. (T. 150.) This substitution inflated the IQ score.

In addition, the WISC-IV, used by the school, has eliminated the Picture Arrangement subtest which further undermines a direct comparison between J.N.'s performance on the two tests. Dr. Marten noted that J.N.'s "score of 1 in Coding and Picture Arrangement suggest very poor nonverbal psychomotor integration when asked to perform under time restraint as well as nonverbal sequential and social reasoning, respectively. [J.N.] performed slowly on the 'Coding' sub-test and also made one error further suggesting the likelihood of some sensorimotor integration difficulty." (R. 139.)

Dr. Marten cogently explained that J.N.'s scores on the WISC-III and the WISC-IV are consistent with one another, and the differences in the test results are merely a function of the testing methodology and the structure of the two versions of the test.

Dr. Marten "emphasized that the findings of his WISC IV should not be interpreted as an invalidation of the findings of his WISC-III. Rather they serve to highlight the relatively different functions measured by the two test protocols, especially involving the comparison between his Performance IQ on the WISC III versus that of his Perceptual Reasoning and Processing Speed Indices on the WISC IV." (R. 149.)

I find that this new evidence from Dr. Marten is material. If this evidence was considered, there is a reasonable probability that the ALJ would have decided that the WISC-III testing performed by Dr. Marten was valid and not inconsistent with the school and found that J.N. was disabled based on the performance IQ score in those tests. Accordingly, the evidence should have been considered by the Appeals Council. *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

Indeed, in this case the Appeals Council did review the new evidence and found that it did not provide a basis for review of the ALJ's decision. The Tenth Circuit has held that this type of statement is "an implicit determination that appellant had submitted qualifying new evidence for consideration", and the Appeals Council is required to consider this evidence. *See Foy v. Barnhart*, No. 04-7103, 2005 WL 1526103 (10th Cir. June 29, 2005). This new evidence was thus properly considered by the Appeals Council and is part of the administrative record to be considered by me when evaluating the ALJ's decision for substantial evidence. *O'Dell*, 44 F.3d at 859.

I find, from my review of the administrative record, that the ALJ's decision is not supported by substantial evidence. The ALJ's reasons for rejecting the opinion of Dr. Marten regarding J.N.'s performance IQ, *i.e.*, that the validity of J.N.'s IQ scores as measured by Dr. Marten are questionable considering the higher overall results J.N.

obtained through the WISC-IV (R. 12.), do not appear valid in light of Dr. Marten's later report.  There is no other evidence in the record that compares the two test scores in light of the raw data and analyzes whether the scores can be reconciled.   If the ALJ had the benefit of reviewing Dr. Marten's report, his decision thus may well have been different.

The Commissioner argues, however, that the ALJ's findings are consistent with the opinion of Dr. Hanze, a state agency psychiatrist who reviewed the record and determined that J.N.'s impairments did not meet or equal the requirements of the Listings.  (R. 142-147).  However, the ALJ did not rely on that report in his decision and it thus cannot be a basis to affirm the ALJ's decision.  *See Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) (a post hoc rationale is improper because it usurps the agency's function of weighing and balancing the evidence in the first instance . . . judicial review is limited to the reasons stated in the ALJ's decision").

Further, it is questionable what weight should be given Dr. Hanze's report given the fact that he did not examine the Plaintiff and did not prepare a detailed report explaining his findings.  "[F]indings of a nontreating physician based upon limited contact and examination are of suspect reliability."  *Frey v. Bowen*, 816 F.2d 50-8, 513 (10th Cir. 1987).  "Such evaluation forms, standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence."  *Id.*  If the ALJ relies heavily on opinions of an agency medical consultant that did not examine the claimant, those "opinions must themselves find adequate support in the medical evidence".  *Lee v. Barnhart*, No. 03-7025, 2004 WL 2810224, at * 3 (10th Cir. Dec. 8, 2004).  The record does not appear to contain medical evidence that supports the ALJ's

-12-

decision to reject the performance IQ assessed by Dr. Marten, as discussed previously. Finally, as noted in Plaintiff's reply brief, Dr. Hanze's opinion was formulated without the benefit of the raw test data or Dr. Marten's subsequent analysis. Thus, the validity of the opinion is questionable.

The ALJ also stated, however, that although J.N. receives special education instruction for his morning classes with additional help in his afternoon classes, "his grade reports indicate that he has been rated either as proficient or at least partially proficient in his schoolwork. . . ." (R. 11.) Further, he noted that Dr. Marten's "rule out diagnosis of borderline intellectual functioning is consistent with the claimant's results and school reports, but there is little support for a conclusion that he carries a diagnosis of mental retardation as evidenced by the testing results reported by the school psychologist." (*Id.*) It is questionable whether those reasons given at step two should be presumed to also apply at step three, since the ALJ did not reference these issues at step three. Nonetheless, I will consider them in assessing the ALJ's decision.

First, the fact that J.N.'s grade reports rate him as either proficient or partially proficient does not take into account the fact that the IEP required modified grading for J.N. Without contacting the teachers who assigned the grades, there is no way to determine whether these grades were really accurate. Also, the ALJ selectively applied the evidence regarding the school records. There is evidence in those records which can be construed to be highly consistent with a performance IQ low enough to satisfy Listing 112.05C.

Specifically, J.N. has been in special education classes since the first grade. Although he participates in some regular classes, those are limited to non-academic

-13-

activities of gym, music and art.  His school has assigned someone to assist J.N. in regular classes because he is unable to perform effectively on his own.  The need for such a high level of individualized support is arguably consistent with a performance IQ of 59.  Further, the 2005 IEP reflects that: (1) J.N. "is not proficient in his reading, writing and math goals. He has a hard time remaining on task in class which causes him to fall behind in his work. He also misses much of the lessons taught because he cannot focus or understand instruction" (R. 123); and (2) "He needs extra time to complete assignments, frequent checks for understanding, small groups and peer tutoring. He needs a scribe for testing, and/or written assignments, and frequent redirection for completion of tasks. He needs preferential seating, and modified grading." (*Id.*)  The ALJ did not properly take this evidence into account in reaching his decision.

The ALJ also stated in support of his findings that J.N. answered simple questions at the hearing and the ALJ considered him "rather engaging."  He also noted that J.N. plays soccer, enjoys his teachers and math classes; was "attentive during the hearing," was able to answer questions from his mom regarding his school schedule, and J.N.'s IEP noted that he rated well in getting along well with teachers, being respectful and well behaved.  (R. 13.)

I agree with Plaintiff that none of these factors are inconsistent with a low performance IQ.  Mentally retarded individuals are frequently polite, friendly and "engaging" and nothing in the record supports a finding to the contrary.  The ability to answer simple questions at a hearing such as "who was your favorite teacher," "do you have recess where you go out and play," and "do you have friends in your neighborhood?" (*id.* 34, 37) also does not rule out a finding that J.N. is mentally retarded

based on his Performance IQ. Moreover, there is no reason that a low performance IQ would necessarily prevent J.N. from playing soccer nor make him so oblivious that he could not remember the days of the week that he regularly attends speech therapy. (*Id.* 26). These were improper lay judgments by the ALJ and are thus not substantial evidence to support the ALJ's determination that J.N. does not meet the requirements of Listing 112.05C.

The Commissioner also argues, however, that J.N. does not meet the other requirement of 112.05; namely, that J.N. exhibits "significantly subaverage general intellectual functioning with deficits in adaptive functioning." The ALJ found in evaluating J.N.'s credibility that J.N. "has few significant problems in . . . areas of functioning" other than intellectual functioning. (R. 13-14.)

I find that the ALJ did not properly assess whether J.N. met this criteria of 112.05. First, the ALJ did not appear to address whether Plaintiff had significantly subaverage general intellectual functioning. His finding of a severe impairment of borderline intelligence and that Plaintiff had marked limitations in his intellectual functioning (R. 14) may well meet this prong, but the issue was not properly analyzed. Further, there is other evidence in the record which supports a finding that J.N. meets this prong of the Listing. As noted above, Dr. Marten's testing and opinions as well as his later report support a finding that Plaintiff has significantly subaverage general intellectual functioning, as discussed above.

Second, I find legal error with the ALJ's determination that J.N. does not have deficits in other areas of adaptive functioning. The ALJ relied on factors that are not particularly relevant to adaptive functioning, such as the fact that J.N. enjoyed his

-15-

teachers, played soccer and was "rather engaging" (R. 13) and made an improper lay judgment that translates to a finding that J.N. had no deficits in adaptive functioning. The ALJ also selectively applied the evidence in finding that J.N. did not have deficits in adaptive functioning. An ALJ may not pick and choose amongst the evidence in the record, "'using portions of evidence favorable to his position while ignoring other evidence.'" *Carpenter v. Chater*, 537 F.3d 1264, 1265 (10th Cir. 2008) (quotation omitted). "The 'failure to apply the correct legal standard[s] . . . is grounds for reversal.'" *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation omitted).

For example, the ALJ found as to the domain of attending and completing tasks that once J.N. began taking medication, he was able to complete his assignments. (*Id.* 15.) This ignores the substantial evidence in the record, including the IEP and Dr. Marten's testing, which indicated that J.N. had problems with concentration, that he often was unable to complete tasks because of a lack of focus, and/or that he required substantial extra supervision in order to be able to complete tasks. As to the domain of interacting and relating with others, the ALJ found that Plaintiff had less than marked limitations because J.N. reported he had friends and the school noted as a strength J.N.'s ability to get along with others. (*Id.* 16.) This ignores the evidence that J.N. had "borderline social judgment and reasoning skills", problems with aggression towards his peers and siblings and difficulty with receptive and expressive language skills. (*See, e.g.*, 136-37, 139). The ALJ also did not give proper weight to evidence that supported deficits in J.N.'s ability to care for himself, such as the fact that he was unable to fully dress himself or wash his hands thoroughly (*id.* 136) and that he bit his hand. Biting one's hand could be construed as a self-soothing behavior that is developmentally

regressive or self-injurious behavior, areas that the ALJ acknowledged could demonstrate a deficit in caring for oneself. (*Id.* 17.)

The final question is whether the ALJ's decision should be reversed outright with an award of benefits or whether the case should be reversed and remanded to the Commissioner. I find that a remand to the Commissioner is appropriate for him to consider the new evidence submitted to the Appeals Council as well as properly weigh the other evidence and remedy the errors noted in this Order. *See Chavez v. Barnhart*, No. 03-2298, 2005 WL 256532, at *3 (10th Cir. Feb. 3, 2005) (where evidence is new, material and chronologically relevant, such that it reasonably would have changed the outcome of the decision, the appropriate remedy is a remand to the Commissioner, not an award of benefits); *see also Lawson v. Chater*, No. 95-5155, 1996 WL 195124, at *2 (10th Cir. April 23, 1996).

IV. CONCLUSION

Based upon the errors described above, it is

ORDERED that this case is **REVERSED AND REMANDED** to the Commissioner for further factfinding and a rehearing pursuant to sentence four in 42 U.S.C. § 405(g).

Dated March 26, 2010

BY THE COURT:

s/ Wiley Y. Daniel  
Wiley Y. Daniel  
Chief United States District Judge